JUDGE FURMAN

*Filed in Chambers*
*July 16, 2018*
*7:30 PM*
*Furman*
*PART I*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

N.T.C., by and through his next friend Rev. Marie
A. Tatro, and H.M.C., by and through her next
friend Mallory Winter,

*Plaintiffs,*

v.

U.S. Immigration and Customs Enforcement
("ICE"), U.S. Department of Homeland Security
("DHS"), U.S. Customs and Border Protection
("CBP"), U.S. Citizenship and Immigration
Services ("USCIS"), U.S. Department of Health
and Human Services ("HHS"), Office of Refugee
Resettlement ("ORR"), Ronald Vitiello, Acting
Director of ICE; Kirstjen Nielsen, Secretary of
DHS; Jefferson Beauregard Sessions III, Attorney
General of the United States; L. Francis Cissna,
Director of USCIS; Kevin K. McAleenan,
Commissioner of CBP; Alex Azar, Secretary of
the Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

*Defendants.*

**CLASS ACTION COMPLAINT**

Civil Action No. _____

# 18 CV 6428

## INTRODUCTION

1.      This is an action to enforce the law.  Plaintiffs are minor children who, for

no legitimate reason, were deliberately separated from their parents at the hands of the

United States government. After tearing them from their parents' arms, the government is

now conditioning family reunification on the parents waiving their children's rights.

These rights are as fundamental as the right to be free from indefinite and coercive

detention, the right to apply for asylum and other forms of immigration relief, and the

right to receive a fair process prior to repatriation.  What the plaintiffs seek is simple, and

in perfect accord with due process: the right to be given advance meaningful notice of the

location to which they are being moved—whether that means deportation, family detention or release, the right to know what rights have purportedly been waived on their behalves, and the right to assert claims for relief based on accurate information.

2.     This is not an action to challenge, or to otherwise re-litigate, the constitutionality of the United States government's family separation policy. That policy is flagrantly unconstitutional and indefensible. This is not an action to block or stall reunifications between parents and children who have been separated at the Southwest border. Those reunifications should proceed with all possible speed for children who desire to be reunified with their parents. It is an action to ensure that the government does not benefit from its illegitimate acts by using the children's separation to force them (or their parents) to give up their rights.

3.     Without any credible claims of abuse, neglect, or parental unfitness, and with no process of any kind, the government detained these minor children, alone and frightened, in facilities often thousands of miles from their parents. Now, in an effort to solve a problem of its own creation, the government seeks to detain the children in facilities that do not meet legal standards, or repatriate them along with their parents, thereby depriving each child of his or her ability to pursue their individual asylum and other child immigrant claims here in the United States. In order to accomplish its goals, the government has resorted to moving children in the middle of the night from one facility to another (often across state lines) without warning the child or anyone else, including the child's legal counsel; depriving the child of access to counsel; and effecting a coercive waiver of the child's due process, asylum, and child immigrant rights.

4.      The defendants are now embarking on a plan to effectuate mass reunifications of parents with their separated children in family detention facilities near the southern border with the purpose of either long-term detention as a family unit or deportation. Their attorneys have received no official notice of these plans and thus cannot adequately advise their clients as they are ethically bound to do. *See* Krause Dec. ¶18.

5.      The Due Process Clause of the Fifth Amendment prohibits the government from denying any person the processes provided by law for seeking asylum or other child immigrant protections. The protections provided by law include the right to pursue a claim for relief under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232, and under the Immigration and Nationality Act Section 101(a)(27)(J) ("INA § 101(a)(27)(J)"), 8 U.S.C. § 1101(a)(27)(J).  Defendants' conduct in depriving children of their access to counsel further violates the protections to which they are entitled under the TVPRA.  *See* 8 U.S.C. §§ 1232(a)(5)(D)(iii), (c)(5). Repatriation absent a voluntary, intelligent, and knowing waiver of asylum and other child immigrant rights by the individual protection-seeker is therefore a violation of due process both procedurally and substantively.

6.      Moreover, repatriation against the wishes of an individual seeking asylum, without a determination that the individual is not entitled to those protections, violates the federal statutory guarantee of a meaningful right to seek asylum to "*[a]ny alien* who is physically present in the United States or who arrives in the United States." 8 U.S.C. § 1158(a)(1) (emphasis added).  Such conduct violates the Administrative Procedure Act, as final agency action without adequate opportunity for review that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

7.     Finally, a court-approved settlement agreement reached in 1997 in *Flores v. Lynch* (the "*Flores* Agreement") established a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." See *Flores* Agreement ¶ 9. The *Flores* Agreement "creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards." *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016). The government is violating the Plaintiffs' rights under the *Flores* agreement by sending Plaintiffs to unlicensed facilities after obtaining coerced waivers from their parents.

8.     In order to protect class members' ability to make informed decisions about their individual legal rights and asylum and other statutory claims, Plaintiffs seek an order from this Court preliminarily and permanently enjoining Defendants from taking any action to remove children from New York State without providing (i) forty-eight (48) hours' notice of such forthcoming action to children and their counsel in order to permit consultation among the child, his or her closest available family member(s), and counsel, and (ii) an opportunity for children to consult with their closest available family member(s) and counsel at the same time before a relocation is effectuated in order to protect the child's ability to make informed decisions about his or her legal rights and potential claims. Plaintiffs further seek a meaningful opportunity to assert their claims to immigration relief and to the relief available under the *Flores* agreement.

## JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including

the Fifth Amendment to the United States Constitution and the federal asylum statute, the federal Declaratory Judgment Act (28 U.S.C. §§ 2201–2202), 28 U.S.C. § 1346 (United States as defendant), the Administrative Procedures Act (5 U.S.C. § 704), ¶ 24(B) of the *Flores* settlement agreement, and pursuant to 28 U.S.C. § 1361 because this action seeks to "compel an officer or employee of the United States or any agency thereof to perform a duty owed to [] plaintiff[s]."

10.     Venue is proper under 28 U.S.C. § 1391(e) because N.T.C., and H.M.C., reside in this District as of the date of the filing of this Complaint, Defendants reside in this District, and a substantial portion of the relevant facts occurred within this District, including Defendants' continued separation of N.T.C. and H.M.C. from their parents.

## PARTIES

### Plaintiff N.T.C. Fled Honduras

11.     Plaintiff N.T.C. is a citizen of Honduras.  He is the twelve (12) year-old son of Ms. J.M.C.A., to whom he has not spoken since they were separated, but who, upon information and belief, is in ICE custody.  N.T.C. brings this lawsuit through a next friend as a result of his incapacity due to his minor status and his unfamiliarity with U.S. law.

12.     Plaintiff N.T.C. and his mother Ms. J.M.C.A. are one of the many families that have sought asylum and other immigration protections in the United States and that recently have been separated by the government.

13.     Plaintiff N.T.C. currently resides at Abbott House in New York State, likely thousands of miles from where his mother is located, although N.T.C. does not know for sure as he has been unable to speak with his mother since they were separated.

14.     Plaintiff N.T.C. seeks asylum and other child immigrant protections in the United States on his own behalf.

15.     Ms. J.M.C.A. is currently in ICE custody at an unknown location.  Upon information and belief, Ms. J.M.C.A. may have been coerced by Defendants into agreeing to repatriation in exchange for reunification with N.T.C., thereby waiving her own and N.T.C.'s asylum and child immigrant protection rights.

16.     Plaintiff N.T.C. has expressed clearly that he would like to be reunified with his mother but that, if his mother were to be repatriated to Honduras, then he would want to remain in the United States.  Plaintiff N.T.C.'s cousin lives in the United States, and N.T.C. would like to go live with his cousin rather than be repatriated.

17.     Plaintiff N.T.C. wishes to remain in the United States in order to pursue his individual asylum and other statutory immigration protection claims.

18.     Plaintiff N.T.C. is currently represented by counsel from The Legal Aid Society.

19.     Reverend Marie A. Tatro served as a Priest at the Trinity Episcopal Church in the South Bronx, New York.  In addition to her role as a Priest, Reverend Tatro assists in the provision of legal support and social service referrals.  Reverend Tatro is also a member of numerous community based organization aimed at assisting immigrant populations, including the New Sanctuary Coalition of New York City.  Previously, Reverend Tatro advocated for indigent and at risk populations for close to two decades as an attorney in various capacities.  Reverend Tatro brings this suit as next friend on behalf of N.T.C. in order to protect N.T.C.'s rights.

### Plaintiff H.M.C. fled Guatemala

20.     H.M.C., is a 13 year old Q'eqchi girl from Guatemala. Her father, a monolingual Q'eqchi speaker, has only had the opportunity to speak with his daughter two times. H.M.C. and her father entered the United States on or about the beginning of June 2018. He has not seen a judge during that time and has not had the opportunity to speak to anyone in his own language, other than his daughter, until July 15, 2018 when he spoke with an attorney from Public Counsel. Upon information and belief, H.M.C.'s father was extremely overwhelmed by his current situation as no one spoke to him in his first language to explain the situation to him until yesterday. It is unclear if he understands the posture of his case at the moment. H.M.C. herself is unclear whether she wants to be reunified as she has not been able to determine the circumstances of reunification. She does not want to be placed in family detention that does not meet minimum standards.

21.     Mallory Winter is a Licensed Master Social Worker.  Since August 2016, Ms. Winter has worked as a Staff Psychotherapist at the Brooklyn Center for Psychotherapy in Brooklyn, New York providing individual psychotherapy to adults and children age 5 and up.  She previously served as the New York & Connecticut Branch Director/Adoption Coordinator, and oversees counselors in providing support to children and families.  Ms. Winter has extensive experience providing counseling and support to vulnerable children populations.  Ms. Winter brings this suit as next friend on behalf of H.M.C. in order to protect H.M.C.'s rights.

### The Government Defendants

22.     Defendant U.S. Department of Homeland Security ("DHS") is responsible for enforcing the immigration laws of the United States.

7

23.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

24.     Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the United States' border.

25.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that, through its asylum officers, conducts interviews of certain individuals apprehended at the border to determine whether those individuals have a credible fear of persecution and should be permitted to apply for asylum.

26.     Defendant U.S. Department of Health and Human Services ("HHS") is a department of the executive branch of the U.S. government that has authority over "unaccompanied" noncitizen children, including custody of "unaccompanied" noncitizen children.

27.     Defendant Office of Refugee Resettlement ("ORR") is a program of the Administration for Children and Families, an office of HHS, that provides care of and placement for "unaccompanied" noncitizen children.

28.     Defendant Ronald Vitiello is sued in his official capacity as the Acting Director of ICE.

29.     Defendant Kirstjen Nielsen, is sued in her official capacity as the Secretary of the Department of Homeland Security.  In this capacity, she directs each of the sub-agencies within DHS: ICE, USCIS, and CBP.  As a result, Defendant Nielsen has

responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum or other relief.

30.     Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States.  In this capacity, he has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, and is empowered to grant asylum or other relief.

31.     Defendant L. Francis Cissna is sued in his official capacity as the Director of USCIS.

32.     Defendant Kevin K. McAleenan is sued in his official capacity as the Commissioner of CBP.

33.     Defendant Alex Azar is sued in his official capacity as the Secretary of HHS and is a legal custodian of one or more Plaintiffs.

34.     Defendant Scott Lloyd is sued in his official capacity as the Director of ORR and is a legal custodian of one or more Plaintiffs.

## FACTS

35.     Over the past year, the government has separated thousands of children fleeing persecution from family members after they were apprehended together at the U.S. border.  Although there have been no allegations that the Plaintiffs' parents are unfit or abusing their children in any way, the government has forcibly separated each of these children from his or her parents and detained each child, often far away, in government funded facilities for "unaccompanied" minors.

36.     On April 6, 2018, Attorney General Sessions formally announced a "zero-tolerance" policy pursuant to which DHS would refer all illegal southwest border crossings to the Department of Justice for prosecution.[1]

37.     On May 7, 2018, Attorney General Sessions publicized that, pursuant to the "zero tolerance" policy, any child crossing the southwest border of the United States would be automatically separated from his or her parents or other adults with whom the child was traveling.[2] The stated goal of this policy was to serve as a deterrent for migrant parents who enter the United States without authorization accompanied by their children.[3] Attorney General Sessions's statements make clear that family separation is not a collateral consequence of regular law enforcement under this policy. It is an explicitly intentional goal.

38.     Pursuant to this new federal law-enforcement policy, thousands of children apprehended with their parents at the border were automatically and forcibly separated from their parents and transferred to the custody of ORR for placement elsewhere in the United States. This policy was imposed on all families, regardless of the age of the child or children. Upon information and belief, Defendants have applied this policy to forcibly separate children, including those who were not yet a year old from their parent or parents and to place each child in ORR custody, often thousands of miles away from the child's parent or parents. Defendants have thus created thousands of

---

[1] *See* Press Release, Office of Pub. Affairs, U.S. Dep't of Justice, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (April 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[2] *See* Press Release, Office of Pub. Affairs, U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[3] *See id.* ("If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law.").

purportedly "unaccompanied" children—those who entered the country with a parent but were, pursuant to the "zero tolerance" policy, forcibly separated from their parent or parents by ICE or CBP immediately thereafter.

39.     Plaintiffs and proposed class members were transferred to facilities in New York State, often hundreds or thousands of miles from their initial apprehension and from their parents.  Upon information and belief, at least 300 migrant children separated from their parents at the southwest U.S. border have been transferred to New York State.[4]

40.     The parents of each of these children, including Plaintiffs' parents, have likewise been transferred to detention facilities across the country to await their civil immigration proceedings.  For instance, Plaintiff N.T.C.'s mother was transferred to an unknown location.  *See e.g.* Krause Dec., Martinez Dec., and Rieser-Murphy Dec.

41.     There is overwhelming medical evidence that the separation of a child from his or her parent will have a devastating and toxic impact on the child's well-being, especially where there are other traumatic factors at work, and that this damage can be permanent. The American Academy of Pediatrics has repeatedly denounced any policy or practice of separating migrant children from their parents, noting in a January 2018 letter signed with more than 200 other organizations that "[f]orced separation disrupts the parent-child relationship and puts children at increased risk for both physical and mental illness. . . . [T]he psychological distress, anxiety, and depression associated with

---

[4] *See* Letter From Governors Brown, Cuomo, Inslee, Malloy, Murphy and Wolf to Secretaries Azar and Nielsen (July 6, 2018),
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/FINAL_Dem_Gov_Letter_on_Family_Reunification_7.6.pdf.

separation from a parent would follow the children well after the immediate period of separation—even after eventual reunification with a parent or other family."[5]

42.     On June 20, 2018, President Donald J. Trump issued an Executive Order ("EO") addressing the policy and practice of family separation. EO 13841, "Affording Congress an Opportunity to Address Family Separation," 83 Fed. Reg. 29,435, § 1 (June 20, 2018). The EO announces that it is the "policy of this Administration to maintain family unity, including by detaining alien families together *where appropriate and consistent with law and available resources.*" *Id.* (emphasis added)

43.     The EO further calls for the Secretary of DHS to "maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members." *Id.* § 3(e).

44.     The EO, however, does not *prohibit* the separation of families during the pendency of immigration proceedings. It only expresses a preference against separation where "consistent with law and available resources." *Id.* § 1. Upon information and belief, resources to detain families together are highly limited. Neither does the EO make any provision for reunifying the thousands of families who were separated prior to its issuance.

---

[5] Letter from Am. Academy of Pediatrics et al. to Kirstjen M. Nielsen, Secretary of U.S. Dep't of Homeland Sec. (Jan. 16, 2018),
https://static1.squarespace.com/static/597ab5f3bebafb0a625aaf45/t/5a5e55cf0d9297
a44bbb8d3e/1516131791958/2018_01_16+Child+Welfare+Juvenile+Justice
+Opposition+to+Parent+Child+Separation+Plan.pdf. ; *see also* J.S.R. v. Sessions et al, No. 18-cv-01106-VAB, Ruling and Order on Motion for Preliminary Injunction (D. Conn. July 13, 2018) ("family separation policy has caused irreparable harm to parents partly because of pain inflicted on their children, and noting that "parents, however, are not the only ones suffering from the separations," and that "there is ample evidence that separating children from their mothers or fathers leads to serious, negative consequences to children's health and development," including higher rates of anxiety, depression, PTSD, and more)"

45.     On June 23, 2018, DHS released a Fact Sheet titled "Zero-Tolerance Prosecution and Family Reunification" that set forth a process for family reunification established by DHS and HHS "to ensure that those adults who are subject to removal are reunited with their children *for the purposes of removal.*"[6] The Fact Sheet further stated that "a parent who is ordered removed from the U.S. may request that his or her minor child accompany them." [7]

46.     On June 24, 2018, a DHS official tweeted that parents separated from their children "were quickly given the option to sign paperwork leading to their deportation. Many chose to do so."[8] That same day, a senior administrative official, speaking on the condition of anonymity, confirmed that Defendants did not plan to reunite families until after a parent had lost his or her deportation case, effectively punishing parents who might otherwise pursue an asylum claim or other relief and creating tremendous pressure to abandon such claims so that a parent might be reunited with his or her children.[9]

47.     On or about July 2, 2018, ICE began providing parents subject to final orders of removal with a Separated Parent's Removal Form that offers two choices: (1) reunification with minor children "for the purpose of repatriation to" the parent's

---

[6] Press Release, U.S. Dep't of Homeland Security, Fact Sheet: Zero-Tolerance Prosecution and Family Reunification (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification. (emphasis added).

[7] Ex. A.

[8] *See* @jacobsoboroff, Twitter (June 24, 2018, 5:29 AM), https://twitter.com/jacobsoboroff/status/1010862394103328771.

[9] *See* Maria Sacchetti, Michael Miller & Robert Moore, *Sen. Warren visits detention center, says no children being returned to parents there*, Wash. Post (June 24, 2018), https://www.washingtonpost.com/local/immigration/desperate-to-get-children-back-migrants-are-willing-to-give-up-asylum-claims-lawyers-say/2018/06/24/c7fab87c-77e2-11e8-80be-6d32e182a3bc_story.html.

country of citizenship, or (2) repatriation without reunification.[10]  Under the first option, a

parent's consent to repatriation of themselves and their children effectuates a waiver of

the children's independent asylum and other statutory immigration protection rights, as

repatriated children are not able to pursue asylum and other statutory immigration

protection claims.  Because the only opportunity for family reunification presented by the

Separated Parent's Removal Form requires consent to repatriation and the resulting

abandonment of asylum and other child immigrant rights, the government's use of the

form risks coercing Plaintiff parents into waiving their children's rights as well as their

own. *See* Zambrano Dec.

48.     The Separated Parent's Removal Form provides no mechanism for

preventing the coercive repatriation of a minor child who wishes to remain in the United

States to pursue his or her independent asylum and other child immigrant claims if the

parent of that child requests reunification for purposes of removal. *Id.*

49.     Although the DHS Fact Sheet and the Separated Parent's Removal Form

apply by their terms only to those parents who are subject to removal orders, upon

information and belief, Defendants have used similar coercive tactics to pressure parents

with pending asylum claims to abandon those claims and to agree to repatriation of

---

[10] Ex. B. *See also* Jeremy Stahl, *ICE Deportation Form: Trump Is Making Parents Choose Between Losing Their Children and Deportation,* Slate (July 3, 2018), https://slate.com/news-and-politics/2018/07/ice-deportation-form-trump-is-making-parents-choose-between-their-children-and-deportation.html.  This form was verified to multiple media sources by an ICE spokesperson. *See, e.g.,* Jeremy Raff, *ICE is Pressuring Separated Parents to Choose Deportation,* The Atlantic (July 6, 2018), https://www.theatlantic.com/politics/archive/2018/07/ how-ice-pressures-separated-parents-to-choose-deportation/564461/; Chantal da Silva, *Is ICE Forcing Separated Parents to Choose Between Deportation or Reunifying with Children?,* Newsweek (July 4, 2018), http://www.newsweek.com/ice-forcing-separated-parents-choose-between-deportation-or-reunifying-1008478; Nick Valencia and Tal Kopan, *The options parents facing deportation have after they've been separated from their kids,* CNN (July 3, 2018), https://www.cnn.com/2018/07/03/politics/deportation-parents-separated-from-kids/index.html.

themselves and their children in exchange for reunification.[11] Numerous parents have been told by CBP and ICE agents that they will see their children again sooner if the parent withdraws his or her asylum application and accepts earlier deportation.[12] And, an additional cause for concern is the fact that language barriers complicate communication and put the voluntariness of the waivers into doubt. *See* Hoffman Dec.

50.    On February 26, 2018, the American Civil Liberties Union (ACLU) of San Diego filed a petition for a writ of habeas corpus and complaint for declaratory and injunctive relief on behalf of a mother and child who were forcibly separated without a determination of unfitness regarding the mother. *Ms. L. v. ICE*, Case 3:18-cv-00428-DMS-MDD. On March 9, 2018, the ACLU filed a motion for class certification for similarly situated individuals. Later that month the ACLU filed a memorandum in support of a preliminary injunction which the court granted in part. On June 26, 2017, a federal court judge ordered the reunification of thousands of separated children with their families. On July 13, 2018, the ACLU and the government filed a joint motion regarding the scope of the court's preliminary injunction. Pursuant to this joint motion, the Ms. L

---

[11] *See, e.g.*, Angelina Chapin, *ICE Officials are Pressuring Separated Parents to Sign Deportation Forms*, Huffington Post (July 3, 2018), https://www.huffingtonpost.com/entry/immigration-officials-pressure-separated-parents-deportation-form_us_5b3c060ee4b09e4a8b28656e (reporting immigration agents have told parents they do not have the option to both seek asylum and be reunited).

[12] This practice has been widely reported. *See, e.g.*, Julia Ainsley & Jacob Soboroff, *New Trump Admin Order for Separated Parents: Leave U.S. With Kids or Without Them*, NBC News (July 3, 2018), https://www.nbcnews.com/politics/immigration/new-trump-admin-order-separated-parents-leave-u-s-kids-n888631 (reporting that HHS workers were instructed to reunite families "only if the parents agreed to drop their own asylum claims as well as the claim of their child and be deported"); Dara Lind, *Trump will reunite separated families – but only if they agree to deportation*, Vox (June 25, 2018), https://www.vox.com/2018/6/25/17484042/children-parents-separate-reunite-plan-trump (reporting that parents are being given the choice to fight for asylum without reunification or to be reunited upon repatriation); Jay Root & Shannon Najmabadi, *Kids in Exchange for Deportation: Detained Migrants Say They Were Told They Could Get Kids Back on Way Out of U.S.*, Texas Tribune (June 24, 2018), https://www.texastribune.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could/ (reporting on parents who signed voluntary deportation orders "out of desperation" after being offered reunification in exchange for deportation).

class members were left with a choice between: 1) waiving their right to family integrity by consenting to the separation of their children or 2) waiving their children's *Flores* Settlement rights including "the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a 'licensed program'." In the case where a class member chooses neither option, there is a presumption that they have temporarily waived their children's *Flores* rights until a voluntary, knowing waiver could be obtained. Upon information and belief, Defendants will be moving immigrant children into non-*Flores* compliant adult detention facilities imminently.

51.     Upon information and belief, Defendants are employing these tactics with increasing frequency and intensity to coerce as many parents as possible to abandon claims on behalf of themselves and their children in anticipation of the Court-ordered July 26, 2018 deadline for the reunification of children separated from their families. *See Ms. L. v. ICE*, No. 18cv0428 DMS (MDD), 2018 WL 3129486 (S.D. Cal. June 26, 2018). Without access to counsel and the opportunity to consult with counsel and parents or other close family members, the ability of class members to make informed decisions about their legal rights and potential claims is significantly impaired.

52.     Upon information and belief, Defendants have also resorted to moving children from one facility to another, often from one state to another, in the middle of the night, without warning to the child or anyone else.

53.     The Legal Aid Society heard through non-governmental sources that the government planned to move the class members to undisclosed locations outside of New York. On July 14, 2018, the Legal Aid Society submitted a Demand Notice to Defendants

demanding at least forty-eight (48) hours advance notice of any proposed relocation of our clients; specific details regarding proposed relocation, including location, purpose, and anticipated duration; and an opportunity to speak with each of our clients and their parent/s before any relocation was effected. *See* Krause Dec.

54.     Late in on July 14, 2018, staff from Abbott House, an ORR contracted child care facility, contacted the Legal Aid Society to inform Legal Aid that the FFS told Abbott House to submit releases for separated children. Legal Aid was not provided with specific details regarding the releases, the travel plans, and it appears that the children may be moved in less than 48 hours. *Id.*

55.     On July 14, 2018, the Legal Aid Society sent a demand for notice of transfer of any Legal Aid clients detained at Abbott House, an ORR sub-contracted detention center for children. This demand was sent to ORR Federal Field Specialists Karla Mansilla, & Jill Volovar, ICE Juvenile Coordinator Linda Hyde, as well as Assistant United States Attorneys for the Southern District of New York. On July 15, 2018, Federal Field Specialist Karla Mansilla informed the Legal Aid Society that two Legal Aid clients were being transferred to the Port Isabel Detention Center (PIDC), an adult (ICE) detention center, imminently. On July 16, 2018, ORR informed Legal Aid that a total of eleven (11) child clients would be transferred to PIDC between July 16 and July 17, 2018. The Legal Aid Society has not been provided any further details about the method of transfer or the purpose of transfer. Port Isabel Detention Center is a detention center for adults in ICE custody in Southeastern Texas. It is not Flores compliant and is known for having significant human rights violations in the past. During 2009-2010, detainees housed at PIDC went on a hunger strike to protest the inhumane conditions of

detention there.[13] Allegations against PIDC included physical and sexual abuse detainees, as well as lack of adequate medical care among other deplorable conditions.[14] These inhumane conditions are not appropriate for anyone, however, the vulnerable nature of children put them at increased risk.

## LEGAL FRAMEWORK

*Statutory Framework and Jurisprudence Regarding the Treatment of Children*

56.    In 1985, several children in INS custody initiated a class action in the Central District of California challenging INS policies regarding the detention of alien children. That litigation wound its way through the federal court system—including the Supreme Court, *see Reno v. Flores*, 507 U.S. 292 (1993). *Id.*

57.    In 1997, the parties entered into a court-approved settlement agreement in (the "*Flores* Agreement"). *See* Ex. 9 ISO Motion for a Preliminary Injunction. The Flores Agreement established a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." See *Flores* Agreement ¶ 9. The *Flores* Agreement "creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards." See *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016). The *Flores* Agreement is binding on all successor agencies to the INS, including ORR and DHS.

58.    The *Flores* Agreement spells out a general policy favoring less restrictive placements of alien children (rather than more restrictive ones) and their release (rather

---

[13] Aguilar, Julián, *Starving for Reform*, Texas Tribune (March 9, 2010). *Also see*, Tony Hefner, *Between the Fences: Before Guantanamo, there was the Port Isabel Service Processing Center* (Seven Stories Press 2011).
[14] U.S. Dep't of Justice, *Detention Officer Sentenced for Repeated Sexual Abuse of Detainees*, Apr. 7, 2010, available at https://www.justice.gov/opa/pr/detention-officer-sentenced-repeated-sexual-abuse-detainees

than detention). The Agreement contemplates that, unless detention is necessary to ensure a child's safety or his appearance in immigration court, he must be released "without unnecessary delay," preferably to a parent or legal guardian. See *Flores* Agreement ¶ 14.

59.     In 2002, Congress passed the HSA, dissolving the INS, and entrusting the "the care and custody of all unaccompanied [alien] children, including responsibility for their detention, where appropriate," to the HHS, which in turn delegated authority to ORR. *See* 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279. Senator Kennedy noted was the change was intended to provide "comprehensive services to address the special needs of newcomer children ... tailored to address the[ir] cultural, linguistic, legal, and developmental needs." *Flores v. Sessions*, 862 F.3d 863, 880 (9th Cir. 2017).  It was also intended to ensure that the federal agency charged with caring for UACs had no stake or say in any related immigration proceedings. *See* 6 U.S.C. § 279(c); 153 Cong. Rec. S3001, S3004 (daily ed. Mar. 12, 2007) (statement of Sen. Feinstein) ("This change finally resolved the conflict of interest inherent in the former system that pitted the enforcement side of the [INS] against the benefits side of that same agency in the care of unaccompanied alien children.").

60.     After assuming custody of the UAC, HHS/ORR must "promptly" place the UAC "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

61.     In 2016, the 9th Circuit Court of Appeals held that the Flores Agreement "unambiguously applies both to accompanied and unaccompanied minors, but does not create affirmative release rights for parents." See *Flores v. Lynch,* 828 F.3d 898 (9th Cir. 2016).

62.     Paragraph 24(B) of the *Flores* Settlement sets forth a minor's right to challenge a determination to place the minor in a particular facility when in government custody. The minor may seek judicial review in "any United States District Court with jurisdiction and venue over the matter to challenge the placement determination." *See Flores* Settlement at ¶ 24(B).

63.     Moreover, the *Flores* Settlement requires INS to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others." *See Flores* Settlement at ¶ 11 (emphasis added).

64.     In 2008, Congress recognized the vulnerability of unaccompanied children and created special statutory protections for these children through the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044. The TVPRA provided important protections for unaccompanied children.[15] The TVPRA protects unaccompanied children from non-contiguous countries from being subject to expedited removal and places unaccompanied in 240 proceedings before an immigration judge. *See* TVPRA § 235(a)(5)(D). The TVPRA also gave USCIS initial jurisdiction of unaccompanied children's asylum cases which allows unaccompanied children to pursue their asylum claims in a non-adversarial, more child-friendly setting. *See* TVPRA § 235(d)(7)(B). It also exempts unaccompanied

---

[15] For an overview of these changes, see Deborah Lee, Manoj Govindaiah, Angela Morrison & David Thronson, Practice Advisory, Update on Legal Relief Options for Unaccompanied Alien Children Following the Enactment of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (Feb. 19, 2009), available at
https://www.ilrc.org/sites/default/files/resources/235_tvpra_practice_advisory.infonet.pdf.

children from the one-year asylum filing deadline to unaccompanied children. TVPRA §

235(d)(7)(A). The TVPRA also codified portions of the *Flores* Agreement (e.g. 8 U.S.C.

§ 1232(c)(2)(A) an unaccompanied alien child "shall be promptly placed in the least

restrictive setting that is in the best interest of the child").

## CLASS ALLEGATIONS

65.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2)

on behalf of themselves and a New York State-wide class of all other persons similarly

situated.

66.     Plaintiffs seek to represent the following New York State class:

> All minor children within New York State who enter the
> United States at or between designated ports of entry who
> have been or will be separated from a parent or parents
> absent a determination that the parent is unfit or presents a
> danger to the child who are and detained in ORR custody,
> ORR foster care, or DHS custody. Plaintiffs are each
> adequate representatives of the proposed class.

67.     The proposed class satisfies the requirements of Rule 23(a)(1) because the

class is so numerous that joinder of all members is impracticable. The exact size of the

proposed class is unknown, but, upon information and belief, there are at least one

hundred and seventy-five (175) children presently in custody in New York alone.

68.     The proposed class meets the commonality requirements of Federal Rule

of Civil Procedure 23(a)(2). Each member of the class is subject to a common threat:

compulsory repatriation without a voluntary, intelligent, and knowing waiver of his or her

asylum and other child immigrant rights and/or the threat that their rights to minimum

standards in detention have been waived. By definition, all class members are subject to

these threats and none has been asked to provide a waiver of his or her individual rights.

This Complaint raises questions of law common to members of the proposed class,

including: whether Defendants' coercive practice of conditioning reunification of children with their parents upon the parents' waivers of their children's rights violates class members' constitutional Due Process rights, statutory rights, and rights under the *Flores* Consent Decree.

69.     The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiffs are typical of the claims of the class, and each of the proposed class members are individuals who have been or will be subject to the threat of coercive repatriation or relocation without meaningful notice.  Plaintiffs and the proposed class also share the same legal claims, which assert the same substantive and procedural rights under the Due Process Clause, the asylum statute, and the *Flores* Consent Decree.

70.     The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4).  The representative Plaintiffs seek the same relief as each of the other members of the class—namely, an order directing that Plaintiffs be given meaningful notice prior to their relocation and the opportunity to assert their rights.

71.     Prohibiting Defendants from compelling the repatriation of any minor child against the child's wishes, without affording each child an opportunity to pursue asylum and other child immigrant protections in the United States or, alternatively, having obtained the child's voluntary, intelligent, and knowing waiver of his or her asylum and other child immigrant claims, after consultation with both the class member's parent or close family member(s) and counsel.  In defending their own rights, Plaintiffs will defend the rights of all proposed class members fairly and adequately.

72.     The proposed class is represented by counsel from The Legal Aid Society. Counsel have extensive experience litigating class action lawsuits and other complex cases in federal court, including civil rights lawsuits on behalf of noncitizens.

73.     The members of the class are readily ascertainable through Defendants' records.

74.     The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the class by unlawfully subjecting minor children to the threat of forced repatriation without voluntary, intelligent, and knowing waivers by each of those children of each of their asylum and other child immigrant rights.  Injunctive and declaratory relief is thus appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### COUNT I

### (Violation of Due Process)

### (Against All Defendants)

75.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

76.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to Plaintiffs and all proposed class members.

77.     Plaintiffs and each class member have an interest under the Due Process Clause in not being barred from pursuing their individual asylum and other child immigrant claims through coercive relocation and repatriation by Defendants.

78.     Defendants' coercive practice of conditioning reunification of children with their parents upon the parents' waiver of their children's right to minimum standards

23

for detention, asylum, right to liberty and humane treatment, or other statutory immigration protections violates both Plaintiffs' procedural and substantive due process rights.

79.     Defendants' coercive relocation and repatriation of class members against their wishes violates substantive due process because it denies each class member the right to pursue his or her asylum and other child immigrant claims and claims under the *Flores* Agreement.

80.     Defendants' coercive repatriation of class members against that class member's wishes also violates procedural due process because it denies each class member the opportunity to pursue his or her asylum and other child immigrant rights without any hearing or consultation, much less a voluntary, intelligent, and knowing waiver by the class member of his or her asylum and other child immigrant claims.

81.     Defendants' coercion of Plaintiffs' parents into giving up their children's rights in order to be reunited with their children further violates the due process rights of class members by depriving each class member of the derivative asylum protections to which he or she is entitled under his or her parents' asylum claims.

82.     Defendants' obstruction of class members' access to counsel further violates federal law that provides protections for unaccompanied alien children pursuing asylum and other protections from removal.  8 U.S.C. §§ 1232(a)(5)(D), (c)(5). Deprivation of access to counsel impairs the ability of class members to pursue their individual asylum and other child immigrant claims.

## COUNT II

### (Violation of a Child's Right to Seek Protection Under the Asylum Statute, 8 U.S.C. § 1158)

### (Against All Defendants)

83.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

84.     Under United States law, noncitizens with a well-founded fear of persecution shall have the opportunity to obtain asylum in the United States. 8 U.S.C. § 1158(a). In addition, noncitizens have a mandatory statutory entitlement to withholding of removal where the noncitizen would face a probability of persecution if removed to his or her country of nationality, 8 U.S.C. § 1231(b)(3). Noncitizens have a further mandatory statutory entitlement to withholding or deferral of removal where they would face a probability of torture. Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231).

85.     Class members have a private right of action to challenge violations of their right to apply for asylum under 8 U.S.C. § 1158(a). That right is not barred by 8 U.S.C. § 1158(d)(7), which applies only to certain procedural requirements set out in Section 1158(d).

86.     Defendants' coercive repatriation of class members against their wishes violates federal law that provides for asylum and other protections from removal. Repatriation precludes class members from pursuing their individual asylum and other statutory immigration protection claims.

87.     Defendants' coercion of Plaintiffs' parents into giving up their asylum and other immigration protection claims in order to be reunited with their children also violates federal law by depriving each class member of the derivative asylum protections to which he or she is entitled under his or her parents' asylum claims.

## COUNT III

### (Violation of a Child's Right to Liberty & Rights Under the *Flores* Settlement)
### (Against All Defendants)

88.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

89.     Immigrant children have a statutory, common law, and constitutional right to liberty and to be free from coercive detention settings.

90.     In particular, under the *Flores* Agreement, there is a presumption that a child should be released, and if detained, should be held in the least restrictive setting and in a licensed child-care facility.

91.     Paragraph 24(B) of the Flores Settlement sets forth a minor's right to challenge a determination to place the minor in a particular facility when in government custody. The minor may seek judicial review in "any United States District Court with jurisdiction and venue over the matter to challenge the placement determination." *See Flores* Settlement at ¶ 24(B).

92.     Moreover, the Flores Settlement requires INS to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others." *See Flores* Settlement at ¶ 11 (emphasis added).

26

## COUNT IV

### (Violation of the Administrative Procedures Act, 5 U.S.C. § 704)
### (Against All Defendants)

93.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

94.     Under the Administrative Procedures Act, a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The reviewing court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

95.     The Supreme Court explained in *Bowen v. Massachusetts* that judicial review of administrative actions "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action" and that any alternative remedy advanced by the agency will not be adequate under § 704 where the remedy offers only "doubtful and limited relief." 487 U.S. 879, 901 (1988).

96.     Plaintiffs asserts that separation, and efforts to reunify as a pretext for removal is  a "final agency action" reviewable by the Court, and that this violation of numerous liberty interests in the absence of any pre-deprivation notice or opportunity to be heard, in violation of the APA, the Due Process Clause of the Fifth Amendment, and the INA, the TVPRA and the *Flores* Settlement.

97.     Courts reviewing final agency actions "shall ... hold unlawful and set aside agency actions, findings, and conclusions found to be—(A) arbitrary, capricious, an

27

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2) (A) (emphasis added).

98.    Defendants' forcible repatriation of class members against class members' wishes also violates procedural due process because it denies each class member the opportunity to pursue his or her asylum rights without any hearing or consultation, much less a voluntary, intelligent, and knowing waiver by the class member of his or her asylum claims.

99.    Defendants' coercion of Plaintiffs' parents into giving up their asylum and protection claims in order to be reunited with their children further violates the due process rights of class members by depriving each class member of the derivative asylum protections to which he or she is entitled under his or her parents' asylum claims.

100.    Under United States law, noncitizens with a well-founded fear of persecution shall have the opportunity to obtain asylum in the United States.  8 U.S.C. § 1158(a).  In addition, noncitizens have a mandatory statutory entitlement to withholding of removal where the noncitizen would face a probability of persecution if removed to his or her country of nationality, 8 U.S.C. § 1231(b)(3).  [Noncitizens have a further mandatory statutory entitlement to withholding or deferral of removal where they would face a probability of torture.  Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231).]

## COUNT V

### (Petition for a Writ of Mandamus, 28 U.S.C. § 1361)

### (Against Individual Defendants)

101.    All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

102.    Under United States law, federal district courts have the authority to issue a writ of mandamus "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to" class members.  28 U.S.C. § 1361.

103.    Class members have a clear right to pursue asylum and other child immigrant protections in the United States and, prior to being finally denied such protections, to be protected from involuntary repatriation, i.e., repatriation in the absence of a voluntary, intelligent and knowing waiver by the class member of his or her asylum and other child immigrant rights.

104.    The individual Defendants each have a duty not to interfere with class members' pursuit of asylum and other child immigrant protections in the United States.

105.    The individual Defendants also each have a duty to provide access to counsel to each of Plaintiff class members.  *See* 8 U.S.C. §§ 1232(a)(5)(D)(iii), (c)(5).

106.    As a writ of mandamus may properly issue where there is no other adequate relief available, Count III is pleaded in the alternative to Counts I and II above.

### PRAYER FOR RELIEF

Plaintiffs request that the Court enter a judgment against Defendants and award the following relief:

A.    Certify a class of all minor children within New York State who enter the United States at or between designated ports of entry who have been or will be separated

from a parent or parents absent a determination that the parent is unfit or presents a danger to the child who are and detained in ORR custody, ORR foster care, or DHS custody.

B.      Name Plaintiffs as representatives of the class, and appoint their counsel as class counsel;

C.      Declare that the coercive relocation and/or repatriation of Plaintiffs and of each of the other class members against his or her wishes, in the absence of a voluntary, intelligent, and knowing waiver by the class member of his or her individual asylum and other child immigrant rights, is unlawful;

D.      Preliminarily and permanently enjoin Defendants from compelling the relocation and/or repatriation of class members without affording each child an opportunity to pursue claims under the *Flores* agreement, asylum and other child immigrant claims in the United States or, alternatively, obtaining a voluntary, intelligent and knowing waiver by the class member of his or her asylum and other statutory immigration protection rights, including after both consultation with the class member's parent or close closest family member(s) and consultation with counsel;

E.      Alternatively, issue a writ of mandamus requiring Defendants to afford each class member an opportunity to pursue *Flores* and/or asylum and other child immigrant claims in the United States in the absence of a voluntary, intelligent and knowing waiver, given after both consultation with the class member's parent or close family member(s) and consultation with counsel, by the class member of his or her asylum and other child immigrant rights;

F.      To protect class members' ability to pursue individual *Flores* and/or

30

asylum and other child immigrant claims, preliminarily and permanently further enjoin Defendants from depriving class members of representation by counsel and from depriving class members represented by counsel from access to and continued representation by their current counsel;

      G.     To protect class members' ability to pursue individual *Flores* and/or asylum and other child immigrant claims, preliminarily and permanently further enjoin Defendants and Defendants' agents from communicating with class members outside the presence of that class member's counsel;

      H.     To protect class members' ability to make informed decisions about their individual legal rights and asylum and other child immigrant claims, preliminarily and permanently enjoin Defendants from taking any action to remove children from New York State without providing (i) forty-eight (48) hours' notice of such forthcoming action to children and their counsel (including, without limitation, the location to which the Plaintiff class member will be moved, the location where the Plaintiff class member's parent or parents currently reside, and whether the movement is for the purpose of release, detention, and/or repatriation), in order to permit consultation among the child, the child's parent or other close family member(s), and counsel to protect the child's ability to make informed decisions about his or her legal rights and potential claims, and (ii) an opportunity for Plaintiff class member to consult with his or her parent or close family member(s) and counsel at the same time before an relocation is effectuated in order to ensure that the child's ability to make informed decisions about his or her legal rights and potential claims is protected;

      I.     Require Defendants to pay reasonable attorneys' fees and costs;

J.      Order all other relief that is just and proper.


Dated this 16th day of July, 2018.
New York, New York

                              Respectfully submitted,


                              _____/s/_____
                              By: Gregory Copeland (GC 1931)


                              Scott Rosenberg, General Counsel
                              Adriene Holder, Attorney-in-Charge, Civil Practice
                              Judith Goldiner, Attorney-in-Charge,
                              Law Reform Unit
                              Hasan Shafiqullah, Attorney-in-Charge,
                              Immigration Law Unit ("ILU")
                              Jennifer Williams, Deputy Attorney-in-Charge, ILU
                              Gregory Copeland, Supervising Attorney, ILU
                              Sarah Gillman, Supervising Attorney, ILU
                              Beth Krause, Supervising Attorney, ILU
                              Jennifer Levy, Supervising Attorney, Law Reform
                              Unit (JL 1681)
                              Elizabeth Rieser-Murphy, Of Counsel, ILU
                              The Legal Aid Society
                              199 Water Street – 3rd Floor
                              New York, NY 10038
                              Tel: 212-577- 3698
                              Fax: 646-365-9369
                              gcopeland@legal-aid.org